IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 19-cv-00560-RBJ

JENNIFER LYN BARRAZA,

     Plaintiff,

v.

ANDREW SAUL, Commissioner of Social Security,

     Defendant.

---

# ORDER

---

This matter is before the Court on review of the Social Security Administration ("SSA")
Commissioner's decision denying claimant Jennifer Barraza's application for Disability
Insurance Benefits ("DIB"). Jurisdiction is proper under 42 U.S.C. § 405(g). For the reasons
explained below, the Court reverses the Commissioner's decision and remands the case for
further consideration.

## I.  STANDARD OF REVIEW

A person is disabled within the meaning of the Social Security Act only if her physical
and/or mental impairments preclude her from performing both her previous work and any other
"substantial gainful work which exists in the national economy." 42 U.S.C. §423(d)(2). To be
disabling, a claimant's conditions must be so limiting as to preclude any substantial gainful work
for at least twelve consecutive months. *See Kelley v. Chater*, 62 F.3d 335, 338 (10th Cir. 1995).

This appeal is based upon the administrative record and the parties' briefs. In reviewing
a final SSA decision, the District Court examines the record and determines whether it contains

substantial evidence to support the decision and whether SSA applied correct legal standards. *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996). The District Court's determination of whether the ruling by the Administrative Law Judge ("ALJ") is supported by substantial evidence "must be based upon the record taken as a whole." *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). A decision is not based on substantial evidence if it is "overwhelmed by other evidence in the record." *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988). Evidence is not substantial if it "constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Reversal may be appropriate if the Commissioner applies an incorrect legal standard or fails to demonstrate that the correct legal standards have been followed. *Winfrey*, 92 F.3d at 1019.

## II. BACKGROUND

### A. Factual Background

Ms. Barraza is a forty-nine year old woman who initially alleged disability due to acute osteoarthritis, dyslexia, five surgeries on her right foot including fusion, and reconstructive ligament surgery. R. 256. She has also been diagnosed with low thoracic and lumbar spondylosis, osteoarthritis, hypothyroidism, and an ovarian cyst. R. 41, 73.

On December 1, 2014 Ms. Barraza met with her primary care provider, Kristen Winterringer, PA-C, of Metro Community Provider Network ("MCPN") Aurora South, as a follow-up to a recent emergency room visit. R. 334. Ms. Barraza reported that she could not stand, sit, or push carts at work for long periods of time. *Id.* She also reported that she had trouble moving, and that she felt "like someone is constantly stabbing the left side of [her] back." *Id.* On examination, Ms. Winterringer found paraspinal muscle tenderness, a limping gait without the use of assistive devices, "DTRs 2+ and symmetric bilaterally at knees and ankles,"

and a "decreased active ROM of thoracic and lumbar spine." R. 335. Ms. Winterringer concluded that Ms. Barraza had mild low thoracic and lumbar spondylosis, as well as osteoarthritis as diagnosed by a chiropractor. *Id.* Ms. Winterringer referred Ms. Barraza to physical therapy and for a Functional Capacity Examination. R. 336–37. Ms. Winterringer penned a letter that same day stating that Ms. Barraza "may return to work without restrictions," but that she "should be allowed to rest if [her] pain returns." R. 470.

Ms. Barraza had a follow-up appointment with Ms. Winterringer on January 21, 2015. R. 472. Ms. Barraza reported that she was still experiencing a lot of back pain. *Id.* A review of her x-rays from 2012 showed mild lordosis, multilevel anterior osteophytes within the low thoracic and lumbar spine regions, a depicted spine, and no spondylolisthesis or spondylolysis. *Id.* Ms. Winterringer concluded that Ms. Barraza had mild low thoracic and lumbar spondylosis. *Id.*

On January 26, 2015 an MRI of her lumbar spine revealed: "five non-rib-bearing lumbar-type vertebrae"; a "[b]road-based left posterolateral disc protrusion at L4-5 result[ing] in mild left lateral recess narrowing contacting the descending left L5 nerve root"; "repeated of source of left L5 radiculopathy"; "spondylosis involving the thoracolumbar spine, most prominent at L4-5"; and "diffuse facet joint arthropathy with facet joint bone edema bilaterally at L3-4." R. 361. An MRI of her pelvis and sacrum from the same date revealed "minimal age-appropriate osteoarthritis at the sacroiliac joints." R. 480.

On February 17, 2015 Ms. Barraza attended a consultative examination with Dr. Stanley Ginsburg, as requested by the Disability Determination Services. R. 366. Dr. Ginsburg noted that Ms. Barraza's chief complaints were back pain and leg numbness. *Id.* He noted her history of "spontaneously occurring right paralumbar pain with numbness in her legs and pain in the left thigh and right foot which tingles." *Id.* He noted: "The claimant was seen at [Aurora] South and

a general medical evaluation was carried out. Back pain was a primary complaint. A significant evaluation, however, was not carried out." *Id.* He did not review prior imaging reports but noted that Ms. Barraza said that "an MRI recently showed 'a dis[c] out of place.'" *Id.*

In Dr. Ginsburg's own physical exam of Ms. Barraza, he noted that she was able to tandem walk, had a negative Romberg, and could do heel-shin and finger-nose testing. R. 367–68. She had positive straight leg raising on the left in the supine position. R. 368. He noted normal strength, coordination, cerebellar function and tone, motor strength, and muscle bulk and tone. *Id.* Per a sensory exam he noted normal "[u]tilizing pinprick, vibration, position and touch." R. 369. His diagnosis was: "[m]ultiple pains with no definitive documentation allowing one to make a diagnosis" and "[l]umbar radicular symptoms without significant abnormalities on examination." *Id.*

Dr. Ginsburg limited Ms. Barraza's standing and walking capacity to four hours; limited her lifting and carrying to twenty pounds occasionally and ten pounds frequently; and found that she should avoid climbing, balancing, stooping, kneeling, crouching and crawling because of her lumbar problem. *Id.* He found she had no maximum sitting capacity. *Id.* He ordered x-rays, which on February 19, 2015 showed mild degenerative disc disease and facet arthropathy at L5-S1. R. 370.

On March 2, 2015 Dr. Brian Fuller of Mountain Spine and Pain Physicians ("MSPP") examined Ms. Barraza. R. 386–87. Dr. Fuller noted that Ms. Barraza complained of "low back pain with radiation to the left buttock and hip as well as the bilateral anterior thighs," and "constant aching 8/10 discomfort with standing greater than sitting and improved rest." R. 386. Upon examination, Dr. Fuller found that Ms. Barraza was positive for left Fortin's test and left Faber, and that she experienced pain upon "palpation of left origin of piriformis" and upon

"bilateral lumbar facet loading maneuver." R. 387. Dr. Fuller's differential diagnosis included sacroiliitis, perform syndrome, greater trochanteric bursitis, referred pain, radicular pain, bilateral anterior high pain, and mononeuropathy. *Id.* Dr. Fuller recommended a treatment plan that included spinal injections and a nerve block. *Id.* He noted that Ms. Barraza may benefit from physical therapy, but that she had previously tried physical therapy without benefit. *Id.*

MSPP subsequently performed several procedures on Ms. Barraza. On March 27, 2015 MSPP gave Ms. Barraza a sacroiliac intraarticular injection in the left sacroiliac joint for her sacral pain. R. 384. On April 10, 2015 MSPP performed a transpiriforms sciatic nerve block and greater trochanter steroid injection for her sacral pain, greater trochanteric bursitis, and lateral hip pain. R. 381. On April 17, 2015 MSPP gave Ms. Barraza a lumbar transforaminal epidural steroid injection in the left lumbar for her low back pain and radiculitis. R. 379. On June 9, 2015 MSPP gave Ms. Barraza her first lumbar medial branch block for her low back pain and lumbar spondylosis. R. 377.

On December 21, 2015 Ms. Barraza met with healthcare provider Deborah McCullough, PA-C, of MCPN Estes Street Clinic after she slipped and fell on ice. R. 493, 496. Ms. Barraza explained that she had been "lifting a carseat which contained her grandson as she was walking and slipped and fell onto her buttocks." R. 496. Ms. Barraza also reported a history of chronic back pain. *Id.*

On January 14, 2016 Ms. Barraza met with Ms. Winterringer as a follow-up visit regarding her fall. R. 501. Ms. Barraza reported "unchanged if not worsening" chronic back pain and reported that the injections recommended by Dr. Fuller and performed by MSPP had not helped. *Id.* Ms. Winterringer noted that after the injections Ms. Barraza had been referred to a surgeon, who had recommended back surgery. *Id.* Ms. Barraza did not want surgery because

there was only a fifty percent chance of success. *Id.* Ms. Barraza reported difficulty working, noting that she had "tried many types of work from retail, sitting in an office to cleaning houses and all of which cause her back to hurt too badly to work." *Id.* Ms. Winterringer also noted Ms. Barraza's limping gait and obesity. R. 502.

On June 27, 2016 Ms. Barraza met with Krista Enns, PA-C, of MCPN Estes Street Clinic. R. 506. Ms. Enns noted Ms. Barraza's back pain and the surgeon's recommendation to have Dr. Fuller administer more back injections. R. 507. Ms. Barraza stated that she never followed up with Dr. Fuller's office because they never called her. *Id.* Ms. Barraza stated that she was experiencing pain three times per day. *Id.* Ms. Enns noted that Ms. Barraza had a BMI of 31.79 out of a recommended range of 19–25. R. 506. Ms. Enns advised Ms. Barraza to ask a spine specialist about work abilities, to avoid excess lifting, pushing, and pulling, and to look for work that involved more sitting. R. 507.

On July 5, 2016 MSPP gave Ms. Barraza a second lumbar medial branch block. R. 514. On July 18, 2016 MSPP gave Ms. Barraza a right lumbar medial branch radiofrequency lesioning and fluoroscopic guidance. *Id.*

Following the ALJ's decision on November 23, 2016, Ms. Barraza continued to receive treatment. R. 80. On March 2, 2017 Ms. Barraza attended an initial consultation with Dr. Richard Kim of Colorado Brain & Spine Institute ("CBSI"). R. 24. Ms. Barraza was 5'6" and weighed 200 pounds, with a BMI of 32.28. R. 25. She reported her history of chronic low back pain, as well as current low back pain radiating to the right anterior thigh, worsening pain when she remained in a single position for long, and problems with balance. R. 24, 28. Dr. Kim diagnosed her with lumbago. R. 28.

On March 16, 2017 Ms. Barraza attended a follow-up with Dr. Kim. She was 5'6" and

weighed 202 pounds, with a BMI of 32.60.  R. 18.  Dr. Kim found normal cerebellar and neurologic testing, including normal Romberg, finger to nose, rapid alternating movements, finger dexterity, and tandem gait.  R. 21.  Upon lumbosacral exam he found normal forward flexion but moderate decrease in degrees in the range of motion in her right and left lateral bend, and severe decrease in degrees in hyperextension.  *Id.*  He also found abnormal right toe-walking.  *Id.*  Upon motor exam he found that her gait was slow and mildly antalgic, but she had 5/5 strength bilaterally in all muscle groups.  *Id.*  Upon a sensory exam he found normal light touch sensation, and upon a reflex exam he found normal bilateral deep tendon reflexes in the upper and lower extremities, downgoing bilateral toes, and absent clonus. R. 22.

Dr. Kim also reviewed diagnostic studies.  Of a March 13, 2017 MRI of her lumbar spine, Dr. Kim noted a degenerative L4-5 disc without bulge; otherwise normal discs; mild lower lumbar facet arthropathy; and a left renal lesion, most likely a cyst.  *Id.*  Of a March 13, 2017 CT of her lumbar spine, Dr. Kim noted mild lumbar facet arthrosis and mild disc space narrowing at a few levels.  *Id.*  Of a March 10, 2017 lumbar spine x-ray, Dr. Kim noted degenerative lumbar spine disc disease, mild radiographically.  *Id.*  Dr. Kim ultimately diagnosed her with lumbar spondylosis with radiculopathy and encouraged her, among other things, to lose weight.  *Id.*

On May 5, 2017 Ms. Barraza attended a follow-up visit with Dr. Kim after receiving a joint injection.  R. 29.  She reported that before the injection her pain was a 15/10 and after the injection it decreased to a 4/10 for approximately one week before returning to a 15/10.  *Id.*  She reported radiation of pain to the right anterior thigh, cramping, occasional numbness in her right anterior thigh, balance problems, and worsening pain when she stayed in any position for too long.  *Id.*  Upon cerebellar and neurologic testing, Dr. Kim found normal Romberg, normal finger to nose, normal rapid alternating movements, and normal finger dexterity, but abnormal

gait.  R. 32.  Upon lumbosacral exam, he found mild decrease in degrees in the range of motion in forward flexion, hyperextension, and right and left lateral bend.  *Id*.  He found left sciatic notch tenderness, normal toe-walking, positive right Fabere test, and positive compression, thigh thrust, and distraction.  *Id*.  Dr. Kim diagnosed her with cervical myelopathy and recommended right SI joint fusion.  R. 33–34.  On May 12, 2017 Dr. Hai P. Bui of Lakewood Medical Center noted that Ms. Barraza was an "acceptable risk for surgery."  R. 16.

Ms. Barraza underwent right SI joint fusion on May 18, 2017.  R. 35.  On September 20, 2017 she followed up with Dr. Kim to discuss left SI joint fusion.  *Id.*  She was 5'6" and weighed 213 pounds, with a BMI of 34.38.  R. 37.  She reported "minimal sharp pain in the right SI joint" and "persistent sharp, stabbing left lower back pain."  R. 35.  Dr. Kim noted mild decrease in forward flexion, hyperextension, right lateral bend, and left lateral bend.  R. 38.  He also noted left sciatic notch tenderness, positive Fabere Test, and ataxic gait.  R. 38–39.  He diagnosed her with left sacroiliac joint pain.  R. 39.  Ms. Barraza consented to left SI joint fusion, which she underwent on approximately October 25, 2017.  R. 39, 41.

Ms. Barraza had a post-op appointment on November 8, 2017.  R. 41.  Ms. Barraza was 5'6" and weighed 215 pounds, with a BMI of 34.70.  R. 42.  She reported left-side lumbar and buttocks pain.  R. 41.  Dr. Kim referred her to physical therapy.  R. 43.

**B.  Ms. Barraza's Statements**

Ms. Barraza completed a Disability Report and a Work History Report for her initial DIB application, which she submitted on November 5, 2014.  R. 70, 255, 262.  She reported the following conditions: acute osteoarthritis, dyslexia, five surgeries on her right foot including fusion, and reconstructive ligament surgery.  R. 256.  She stated that she had completed the twelfth grade and had attended special education classes in two different high schools between

1985 and 1989.  R. 257.  She did not complete all sections of the Work History Report.  R. 262–67.

Ms. Barraza completed a Function Report on January 5, 2015.  R. 274.  She reported that she could not lift, squat, bend, reach, walk, kneel, climb stairs, sit, stand, or lay down for long periods due to back pain, and that this affected her sleep.  R. 274–75, 279.  She explained that she could walk for approximately two blocks before needing to rest for ten minutes.  R. 279.  She could no longer ride her bike.  R. 102.  She reported that she could pay attention for approximately an hour and that she could finish what she started "most of the time," though she did not explain why her attention span was limited.  R. 279.

Ms. Barraza described her daily activities as "work, come home and try to do housework, laundry, dishes and such."  R. 275.  She explained that every day she prepared simple meals such as sandwiches, ramen noodles, soups, and TV dinners, and that sometimes it took her an hour or more to do so.  R. 276.  She stated she needed help with doing her laundry, cleaning the bathrooms, sweeping, "and more," although she did not explain why or what kind of help she required.  *Id.*  She stated that she did these chores approximately twice a month and it generally took her "all day."  *Id.*  She stated that she shopped at the grocery store or Walmart approximately once a month.  R. 277.  Her hobbies included watching television and reading, although she did not do these activities often because she could not sit for long periods.  R. 278.

At the time she completed the Function Report Ms. Barraza was taking three medications: a lidocaine patch, oxycodone, and ibuprofen.  R. at 281.  She experienced side effects from these medications including numbness in her back, lightheadedness, and drowsiness. *Id.*

Ms. Barraza also completed a Pain Questionnaire on January 5, 2015, the same date as

when she completed the Function Report.  R. 273.  She again listed the same medications and the same side effects.  *Id.*  She also reported experiencing pain "all day long" in her lower left back.  *Id.*

Ms. Barraza completed a second Disability Report for her appeal.  R. 292.  She noted an appointed representative was helping her complete the form.  R. 292–93.  In that form she reported that her condition had not changed since she had completed the initial Disability Report.  R. 293.  She reported she was receiving treatment for back pain (including trouble standing and sitting), pain in her right foot, dyslexia, and carpel tunnel syndrome.  R. 294.

Ms. Barraza testified at the ALJ hearing on September 27, 2016.  R. 70.  She testified that she was 5'6" and weighed 195 pounds, and she lived with her daughter and husband.  R. 90–91.  She testified that she drove about twice per week for approximately one mile.  R. 91.  She testified that she had completed the eleventh grade and attended special education classes, and that she had dyslexia and a third-grade reading level.  R. 92.  She also testified that she was "in pain 24/7," and that some days she laid in bed all day in a fetal position and cried because of the pain.  R. 95, 105.  She testified that she had to do housework slowly and lightly, and she was incapable of taking the laundry to the laundromat, taking out the trash, or vacuuming the floor.  R. 95.  Her daughter helped her with household chores and making dinner.  *Id.*

Her treatment regimen included injections, physical therapy, exercising, and walks.  R. 95–96.  She also used lidocaine patches, which "numb [her back] a little but not a whole bunch."  R. 96.  She reported still being in a lot of pain despite the injections and physical therapy.  *Id.*  Although doctors had suggested back surgery, she reported that she believes she is "not a good candidate" for additional surgery.  *Id.*

Ms. Barraza testified that she had recently worked at Walmart, King Soopers, Waste

Management, and at a motel cleaning rooms.  R. 92.  She left her job as a cashier at Walmart after one month because of her absences due to back pain.  R. 92–93.  She left her job as a courtesy clerk at King Soopers after approximately three months because she was placed on leave of absence for being unable to perform her job duties due to back pain.  *Id*.  She worked at Waste Management sorting trash for approximately three months before leaving because her "boss was getting ready to terminate" her because she had been receiving spine injections.  *Id*.  She worked cleaning motel rooms for approximately three weeks before leaving because of her back pain.  *Id*.

Ms. Barraza further testified that her typical day included cleaning the kitchen, dusting the furniture, making dinner with her daughter, and, if the weather was nice, taking a walk.  R. 100.  For dinner she usually rinsed the meat, put it in the pan, got the vegetables, and set the table, while her daughter pulled out the pots and pans, put the meat in the oven, and took the meat back out of the oven.  *Id*.  She generally took one hour-long nap per day.  *Id*.  She had trouble sleeping at night due to her back pain; she could sleep comfortably for approximately two and a half hours, but generally woke up two to three times per night, at which points she got up for an hour or so before laying back down.  R. 100–01.  She has numbness in her legs about once a week; after sitting for forty-five minutes she must get up and move around for at least twenty to twenty-five minutes.  R. 104.

Ms. Barraza also testified that she had not been to church for a while because it was difficult to sit, kneel, and get back up; she could no longer put on makeup or do her hair; she does not visit anyone, go to the movies or restaurants, volunteer, ride her bike, or spend time on the computer.  R. 101–02.  She noted that she liked to crochet every once in a while.  R. 102.  She further stated that she had trouble spelling and reading.  R. 102–03.  She could not read the

newspaper and understand what a story is about; read a simple adventure or comic book and understand what it is about; look up a word in a dictionary; or understand the difference between an adjective and an adverb. R. 103. Her poor spelling and reading got her fired from her previous job at Horizon, where she produced paperwork for charter buses. R. 102–03.

### C. **Vocational Expert Testimony**

Vocational expert Cyndee Burnett ("the VE") also testified at the ALJ hearing on November 5, 2014. R. 70.

The VE was asked to summarize Ms. Barraza's past work and respective skill and exertion levels. R. 106. The VE testified that Ms. Barraza's past work history included: sales associate, DOT code 299.677-010, SVP 2, which has an exertional level per both DOT and claimant of light; store supervisor, DOT code 185.167-046, SVP 7, which has an exertional level per both DOT and claimant of light; and bus scheduler, DOT code 214.362030, SVP 4, which has an exertional level per both DOT and claimant of sedentary. *Id.* The VE testified that the reading level of the store supervisor is 4, which is high school level. R. 107. The reading level of the bus scheduler is 3, which is seventh to eighth grade level. *Id.* The VE testified that all of Ms. Barraza's prior work as generally and actually performed could be performed by an individual of the same current age, education and work experience as Ms. Barraza, whose RFC restricts her to light work and restricts her from climbing ladders and scaffolds, working at unprotected heights or with dangerous, unprotected machinery, such as a wood chipper, and using vibrating tools. *Id.*

The VE testified that other jobs existed in the regional and national economy that such an individual could perform, including: an assembler of small products, a laundry worker, a cafeteria worker, a document preparer, an addressing clerk, and a charge account clerk. R. 107–

08.  The VE testified that if she was to further restrict the hypothetical individual to only sedentary work, the individual could still perform many jobs, including: bus scheduler, document preparer, addressing clerk, and charge account clerk.  R. 108.

The VE testified that in Ms. Barraza's past relevant work, the average allowable absenteeism is no more than one day per month.  *Id.*  If the hypothetical claimant were off-task for fifteen percent of an eight-hour day outside of regularly scheduled breaks due to pain, needing to change positions, or fatigue, that would eliminate all employment.  R. 108–09.  A hypothetical claimant who could only sit or stand for forty-five minutes at a time before needing to take a break or get up and walk for ten minutes would be off task for more than ten percent of the workday.  R. 109.

### D.  **Procedural Background**

On November 5, 2014 Ms. Barraza filed an application for Disability Insurance Benefits ("DIB"), alleging that she had been disabled since August 1, 2014.  R. 70.  The SSA denied the claim on March 3, 2015, and Ms. Barraza timely appealed on March 27, 2015.  *Id.*  An ALJ held a hearing on September 27, 2016 and issued its decision on November 23, 2016.  R. 70, 80.  The ALJ found that Ms. Barraza was not disabled as defined in the Social Security Act for the relevant period.  R. 80.

On December 10, 2016 Ms. Barraza timely requested review of the ALJ's hearing decision.  R. 215.  The Appeals Council denied this request on October 2, 2017.  R. 8, 13.  On December 5, 2017 Ms. Barraza requested the reopening of her case and/or an extension of time in which to file a civil action.  R. 4.  On December 26, 2018 the Appeals Council denied Ms. Barraza's request for reopening but granted her an extension of time to file a civil action.  R. 1–

## E.  **The ALJ's Decision**

After evaluating the evidence of Ms. Barraza's alleged disability according to SSA's standard five-step process, the ALJ issued an unfavorable decision.  R. 70.  Preliminarily, the ALJ found that Ms. Barraza met the insured status requirements of the SSA through December 31, 2019.  R. 72.

At step one, the ALJ found that Ms. Barraza had not engaged in substantial gainful activity since August 1, 2014.  *Id.*  She found that Ms. Barraza did work after the alleged disability onset date, but that this work activity did not rise to the level of substantial gainful activity ("SGA").  *Id.*  Specifically, although Ms. Barraza earned $3,482 in the first quarter of 2015, this work was an unsuccessful work attempt because she was out of work at least thirty consecutive days and the work activity was discontinued or reduced to a non-SGA level within three months due to the impairment or removal of special conditions essential to the performance of work.  R. 72–73.

At step two, the ALJ found that Ms. Barraza had the following severe impairments: obesity and a disc protrusion at L4-5 contacting a nerve root.  R. 73.  The ALJ found that Ms. Barraza had the following non-severe impairments: mild low thoracic and lumbar spondylosis, hypothyroidism, an ovarian cyst, and minimal osteoarthritis at the sacroiliac joints.  *Id.*  The ALJ also found that Ms. Barraza had the non-medically determinable impairment of dyslexia, noting that although Ms. Barraza claimed to suffer from dyslexia, the record contained no objective medical evidence or diagnostic testing to establish such diagnosis, nor did Ms. Barraza report any mental limitations on her application forms.  *Id.*

At step three, the ALJ found that Ms. Barraza's impairments did not meet or medically

equal the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526). *Id.* The ALJ noted that although there is no Listing in Appendix 1 specific to obesity, she considered the effect that obesity has on co-existing impairments. R. 74. The ALJ found that Ms. Barraza did not meet the requirements under Listing 1.04 (Disorders of the spine), because although "the evidence did show nerve root compromise, the claimant does not show motor loss, muscle weakness, sensory or reflex loss," nor does she show "spinal arachnoiditis with a need to change position or posture more than once every two hours or lumbar stenosis with an inability to ambulate effectively." *Id.* The ALJ further stated that she "considered all of the claimant's impairments individually and in combination but [found] no evidence that the combined clinical findings from such impairments reach the level of severity contemplated in the Listings." *Id.*

At step four, the ALJ found that Ms. Barraza had the residual functional capacity ("RFC") to perform light work as defined in 20 CFR 404.1567(d). *Id.* The ALJ also added to Ms. Barraza's RFC that Ms. Barraza could not climb ladders or scaffolds or work at unprotected heights or with dangerous unprotected machinery or vibrating tools. *Id.* The ALJ found that Ms. Barraza's "statements concerning the intensity, persistence, and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record." R. 77. As such, the ALJ stated that "while the claimant's condition restricts her ability to perform work-related activity, her condition does not preclude all work activity." R. 78.

During her step four analysis, the ALJ summarized the various medical opinions and Ms. Barraza's own statements. R. 74–78. The ALJ did not expressly state what weight she gave to Dr. Ginsburg's opinion as a nontreating provider; instead, she stated that she "affords Dr. Ginsburg's opinion." R. 77. She afforded great weight to treating provider Ms. Winterringer's

December 8, 2014 opinion but only partial weight to Ms. Winterringer's January 14, 2016 opinion. *Id.* She afforded little weight to Ms. Enns' opinion. *Id.* She concluded that Ms. Barraza's objective allegations "described daily activities that are inconsistent with her allegations of disabling symptoms and limitations." R. 75. Ultimately the ALJ found that "[t]he objective findings fail to provide strong support for [Ms. Barraza's] allegations of disabling symptoms and limitations." R. 78.

At step five, based on vocational expert testimony, the ALJ found that Ms. Barraza could perform her past relevant work as a sales associate, store supervisor, and bus scheduler. R. 78. The ALJ found that Ms. Barraza could also perform the following occupations: small products assembler, laundry worker, cafeteria worker, document preparer, addressing clerk, and charge account clerk. R. 79.

## III.  ANALYSIS

### A.  New Evidence Submitted to Appeals Council

Preliminarily, Ms. Barraza asserts that the Appeals Council improperly denied her request to reopen her claim pursuant to new evidence. ECF No. 19 at 22. Under §§ 404.970(b) and 416.1470(b) "the Appeals Council must consider additional evidence offered on administrative review . . . if it is (1) new, (2) material, and (3) related to the period on or before the date of the ALJ's decision." *Krauser v. Astrue*, 638 F.3d 1324, 1328 (10th Cir. 2011) (citing *Chambers v. Barnhart*, 389 F.3d 1139, 1142 (10th Cir. 2004)).

As new evidence, Ms. Barraza presented medical records from a new treating provider that post-date the ALJ's November 23, 2016 decision. ECF No. 19 at 21; ECF No. 20 at 5. Specifically, Ms. Barraza presented evidence from Dr. Kim at CBSI, whom she first saw on March 2, 2017. R. 24. Dr. Kim ordered and reviewed an MRI, a CT, and an x-ray of Barraza's

lumbar spine.  R. 22.  Dr. Kim diagnosed Ms. Barraza with lumbar spondylosis on March 16, 2017.  R. 22.  Per Dr. Kim's recommendation, Ms. Barraza underwent successful right sacroiliac (SI) joint surgery in May 2017 at CBSI.  R. 35.

The Appeals Council determined that these records did not relate to the relevant period because the records were over three months after the ALJ's decision.  R. 1.  Ms. Barraza argues that the records are nevertheless relevant because they relate to the same impairments and show that her "back symptoms and chronic pain were not alleviated with conservative treatment." ECF No. 19 at 21.

I find that the Appeals Council did not err in failing to reopen Ms. Barraza's claim pursuant to these new records because they do not relate to the relevant period on or before the date of the ALJ's decision.  The records come from physicians who did not treat Ms. Barraza until after the ALJ's decision.

## B.  Step Three Error—Listed Impairments

Ms. Barraza asserts that the ALJ failed at step three to properly evaluate whether Ms. Barraza has an impairment or combination of impairments that meet or medically equal a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1.  ECF No. 19 at 17.  At step three of the sequential evaluation process, the ALJ considers whether a claimant is per se disabled because her impairments meet or equal the severity described in the Listing.  *See* 20 C.F.R. § 404.1525; 20 C.F.R. pt. 404, subpt. P, app. 1.  In order to meet a Listing, a claimant must show that she "meet[s] all of the specified medical criteria" in the Listing.  *See Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original) ("An impairment that manifests only some of those criteria, no matter how severe, does not qualify.").

In order for a combination of impairments to "equal" a Listing, the claimant must show that even though the findings related to a single impairment are insufficient to meet the Listing, there are other findings related to an impairment that are at least of equal medical significance to the required criteria. *See* 20 C.F.R. § 404.1526(b). The claimant must establish symptoms, signs, and laboratory findings at least equal in severity and duration to the characteristics of a relevant listed impairment or to the listed impairment "most like" the claimant's impairment. *See id.* The criteria must all be present for at least one year and must all be present at the same time. *See Davidson v. Colvin*, 596 F. App'x 675, 678 (10th Cir. 2014) (unpublished) (noting that a Listing cannot be met if criteria are only intermittently at Listing-level severity).

It is the Commissioner's responsibility to identify potential Listings based on the evidence the claimant has presented and to evaluate the evidence accordingly. *See Fischer-Ross v. Barnhart*, 431 F.3d 729, 733 n.3 (10th Cir. 2005). However, to merit remand by this Court it is the claimant's burden to identify evidence establishing that she met a Listing. *See Lax*, 489 F.3d at 1085 ("To show that an impairment or combination of impairments meets the requirements for a listing, a claimant must provide specific medical findings that support each of the various requisite criteria for the impairment.").

Ms. Barraza argues that (1) the ALJ failed to properly evaluate whether Ms. Barraza's severe spine impairment meets a Listing; (2) the ALJ failed to properly evaluate whether the combination of her nonsevere impairments of thoracic lumbar spondylosis, sacroiliac joint osteoarthritis, and hypothyroidism meet or medically equal a Listing; and (3) the ALJ failed to properly evaluate whether her severe impairment of obesity in combination with her other impairments meets or medically equals a Listing. ECF No. 19 at 17–18. I address each issue in turn.

1.   <u>Spine Impairment</u>

Ms. Barraza claims that the ALJ failed to properly consider Ms. Barraza's spine impairment under Listing 1.04.  *Id.* at 18.  Listing 1.04 requires compromise of a nerve root or the spinal cord, and either: (a) "evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss, and, if there is involvement of the lower back, positive straight-leg raising tests (seated and supine); or (b) spinal arachnoiditis; or (c) lumbar stenosis resulting in pseudoclaudication, manifested by chronic nonradicular pain and weakness, resulting in the inability to ambulate effectively."  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.04 (referring to Listings section 1.00B2b for the definition of ineffective ambulation).  Thus for Ms. Barraza to meet Listing 1.04(a), she must have evidence of both (1) compromise of a nerve root and (2) neuro-anatomic distribution of pain; limitation of motion of the spine; motor loss accompanied by either sensory or reflex loss; and, because this involves the lower back, positive straight-leg raising tests.  *Id.*; ECF No. 19 at 17–18.

Ms. Barraza points to an apparent editing mistake in the ALJ's record.  ECF No. 19 at 17.  The ALJ wrote: "Listing 1.04 requires the presence of a compromise of a nerve root.  The claimant's record is devoid of such evidence.  Furthermore, the evidence did show nerve root compromise, the claimant does not show motor loss, muscle weakness, sensory or reflex loss."  R. 74.  This appears to be a double mistake on the ALJ's part—this section was likely meant to read: "Listing 1.04 requires the presence of a compromise of a nerve root.  Furthermore, *although* the evidence did show nerve root compromise, the claimant does not show motor loss, muscle weakness, sensory or reflex loss."  Indeed, the parties do not dispute that the record

shows evidence of nerve root compromise.  The ALJ at step two found that Ms. Barraza had the "severe" impairment of a disc protrusion at L4-5 contacting a nerve root.  R. 73.  It appears that the ALJ's insertion of the sentence "[t]he claimant's record is devoid of such evidence" was an editing mistake.  Yet I cannot find that this mistake is a mere "scrivener's error."  *See Poppa v. Astrue,* 569 F.3d 1167, 1172 n.5 (10th Cir. 2009) (finding "a mere scrivener's error" harmless).  The ALJ expressly writes two directly conflicting statements regarding the presence of nerve root compromise.  Even though it relatively clear that it was an editing error, it creates more confusion than a mere typo for a claimant attempting to appeal.

However, despite this error, Ms. Barraza has still failed to meet her burden of showing that she meets Listing 1.04.  The ALJ also found that the record did not show motor loss accompanied sensory or reflex loss, one of the requirements under the second prong.  R. 74.  While this record is not entirely devoid of any evidence of motor loss accompanied by sensory or reflex loss, substantial evidence does support the ALJ's finding.  Even if Ms. Barraza may have experienced some motor loss, she did not experience sensory or reflex loss so as to "meet all of the specified medical criteria" in Listing 1.04.  *See Zebley*, 493 U.S. at 530 (emphasis in original) ("An impairment that manifests only some of those criteria, no matter how severe, does not qualify.").

Ms. Barraza cites to several points in the record which she argues show motor loss accompanied by sensory or reflex loss.  ECF No. 19 at 18 (citing R. 368, 386, 411, 422, 466, 485, 603).  Yet her citations support the ALJ's finding.  Ms. Barraza cites the record at page 368, which notes: "Strength, coordination, cerebellar function and tone, and motor strength/muscle bulk and tone were normal on a 5/5 scale."  R. 368.  She cites the record at page 386, which notes slight reflex abnormality ("1/4 deep tendon reflexes of the bilateral pataeliae and achilles

noted") but "5/5 strength of the bilateral lower extremities . . . for all major muscle groups." R. 386–87. She cites the record at page 411, which notes her "[l]imping gait" but also notes normal reflexes, normal strength, and no muscle atrophy. R. 411. She cites the record at page 422, which notes normal strength, and at 466, which notes normal strength and reflexes. R. 422, 466. She cites the record at page 485, which notes nothing of relevance, and at page 603, which again notes her "limping gait." R. 485, 603. Thus the record shows at most a limping gait and one instance of reflex abnormality among several instances of normal muscle tone and sensory and reflex function.

Accordingly, I affirm the ALJ's finding regarding Listing 1.04.

### 2. Combined Nonsevere Impairments

Ms. Barraza argues that the ALJ failed to properly consider whether her nonsevere impairments of mild low thoracic and lumbar spondylosis, minimal osteoarthritis at the sacroiliac joints, and hypothyroidism medically equal a listed impairment under Listing 1.02 (Major dysfunction of a joint) or Listing 9.00 (Endocrine disorders). ECF No. 19 at 18.

First, Ms. Barraza asserts that the ALJ failed to consider whether her combined impairments medically equal Listing 1.02 (Major dysfunction of a joint). 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.02. Listing 1.02 is "[c]haracterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s)," accompanied by either (a) "[i]nvolvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;" or (b) "[i]nvolvement of one major peripheral joint in each

upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c." *Id.*

Thus for Ms. Barraza to medically equal Listing 1.02, she must show evidence indicating or equalling (1) gross anatomical deformity, (2) chronic joint pain and stiffness with signs of limitations of motion or other abnormal motion of the affected joint(s), (3) imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s), and (4) involvement of one major peripheral weight-bearing joint resulting in inability to ambulate effectively. The regulations do not define "gross anatomical deformity" beyond the proffered examples. I understand the term to "refer to a body part (such as a bone, muscle, or joint) that is misshaped in a significant way." *Daniel S. v. Berryhill*, No. 5:18-CV-01504-KES, 2019 WL 1903384, at *3 (C.D. Cal. Apr. 26, 2019).

Ms. Barraza argues that she medically equals Listing 1.02(a) because her record shows that, as a result of her nonsevere impairments of thoracic and lumbar spondylosis and sacroiliac joint osteoarthritis, she had chronic joint pain in her hips that affected her ability to sit, stand, and walk. ECF No. 19 at 17; R. 77, 387, 526, 604, 610. She also points to her MRI showing spondylosis. ECF No. 19 at 17. The government argues that Ms. Barraza does not cite to any evidence indicating that these impairments constitute "gross anatomical deformity," nor has she provided "imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s)." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.02; ECF No. 20 at 11.

The ALJ did not discuss Listing 1.02. Instead she merely asserted that she "considered all of the claimant's impairments individually and in combination but [found] no evidence that the combined clinical findings from such impairments reach the level of severity contemplated in the Listings." R. 74. However, despite the ALJ's failure to discuss this Listing, I find that Ms.

Barraza has not met her burden of showing that these nonsevere impairments constitute a gross anatomical deformity. Indeed, at step two the ALJ found that Ms. Barraza's thoracic and lumbar spondylosis was "mild," and that her sacroiliac joint osteoarthritis was "minimal." R. 73. The ALJ's finding, although bare-bones, is supported by medical imaging in the record. The January 26, 2015 MRI of Ms. Barraza's pelvis revealed "minimal age-appropriate osteoarthritis at the sacroiliac joints," R. 480, although the January 26, 2015 MRI of her lumbar spine revealed spondylosis involving the thoracolumbar spine, most prominent at L4-5. R. 361. The February 19, 2015 x-rays showed mild degenerative disc disease and facet arthropathy at L5-S1. R. 370.

Ms. Barraza also presents new medical imaging. This new imaging post-dates the ALJ's order, and per my discussion above I found that the Appeals Council did not err in refusing to reopen Ms. Barraza's case based on this new medical evidence. However, were I to consider this new evidence, it only supports the ALJ's decision. The March 13, 2017 MRI of Ms. Barraza's lumbar spine revealed "mild" lower lumbar facet arthropathy. R. 22. The March 13, 2017 CT of her lumbar spine revealed "mild" lumbar facet arthrosis and "mild" disc space narrowing at a few levels. *Id*. The March 10, 2017 lumbar spine x-ray revealed degenerative lumbar spine disc disease that is "mild" radiographically. *Id*.

Although the ALJ should have discussed why Ms. Barraza's impairments did not medically equal Listing 1.02, Ms. Barraza has not met her burden at this stage of showing that she did indeed medically equal that Listing. *See Lax*, 489 F.3d at 1085.

Second, Ms. Barraza asserts that the ALJ failed to consider whether her nonsevere impairment of hypothyroidism medically equals Listing 9.00 (Endocrine disorders). *See* 20 C.F.R. Part 404, Subpt. P, App. 1 § 9.00. Listing 9.00 includes "cardiac dysfunction," "thyroid-related weight loss," "hypertensive cerebrovascular incidents (strokes)," "cognitive limitations,

mood disorders, and anxiety," or any parathyroid gland disorders that "affect calcium levels in bone, blood nerves, muscle, and other body tissues." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 9.00 (referencing Listings 1.00, 2.00, 4.00, 5.00, 6.00, 11.00, and 12.00). Ms. Barraza does not identify any evidence that her hypothyroidism caused any of these symptoms. Because she proffers no argument or evidence to indicate that she meets Listing 9.00, she has failed to show that the ALJ erred. *See Lax*, 489 F.3d at 1085.

Accordingly, I will not remand based on the ALJ's alleged failure to consider Ms. Barraza's nonsevere impairments in combination.

### 3. Obesity

Ms. Barraza argues that the ALJ failed to show how she considered obesity. ECF No. 19 at 3–4. To successfully argue that an ALJ failed to consider obesity, a claimant must identify evidence that her obesity caused her greater limitations than the ALJ found. *See Razo v. Colvin*, 663 F. App'x 710, 716–17 (10th Cir. 2016) (unpublished) (noting that "[t]he ramifications of obesity are subsumed within the discussion of [the claimant's] other medical conditions"); *Smith v. Colvin*, 625 F. App'x 896, 899 (10th Cir. 2015) (unpublished).

Here, the ALJ noted Ms. Barraza's obesity and acknowledged that "[o]besity may have an adverse impact upon co-existing impairments." R. 74. The ALJ noted that "[s]omeone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from arthritis alone." *Id.* She then stated that she "considered these factors in reaching the findings at the 2nd through 5th steps of the sequential disability evaluation process." *Id.* Most significantly, she also found that "[n]o treating or examining medical source has specifically attributed additional or cumulative limitations to the claimant'[s] obesity." *Id.*

Ms. Barraza argues that the ALJ "did not cite to any evidence and failed to 'explain' how she arrived at her conclusion."  ECF No. 19 at 20.  It is true that the ALJ's discussion of Ms. Barraza's obesity appears to be largely boiler-plate language.  Yet the ALJ did explain that she arrived at her conclusion precisely because no medical source attributed additional limitations to Ms. Barraza's obesity.  Nor has Ms. Barraza herself identified any evidence indicating otherwise.  Accordingly, I will not remand based on the ALJ's alleged failure to consider Ms. Barraza's obesity.

## C.  Evaluating Medical Opinions

Ms. Barraza argues that the ALJ failed to properly evaluate the medical opinions of Dr. Ginsburg and Ms. Winterringer.  ECF No. 19 at 22–23.  I address both opinions in turn.

### 1.  Dr. Ginsburg's Opinion

First, Ms. Barraza argues that the ALJ erred in evaluating Dr. Ginsburg's opinion.  Specifically, Ms. Barraza claims that the ALJ failed to state what weight she gave to the opinion, and regardless, that the ALJ should have given the opinion less weight because Dr. Ginsburg failed to review Ms. Barraza's MRI results.  ECF No. 19 at 22–23.  An ALJ must "give good reasons in [the] notice of determination or decision" for the weight assigned to a treating provider's opinion.  20 C.F.R. § 404.1527(d)(2); *see also* Social Security Ruling 96–2p, 1996 WL 374188, at *5; *Doyal v. Barnhart*, 331 F.3d 758, 762 (10th Cir. 2003).  The decision "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  SSR 96–2p, 1996 WL 374188, at *5.  Although Dr. Ginsburg is a nontreating provider, an ALJ must still always consider the opinions of nontreating providers and provide specific, legitimate

reasons for rejecting those opinions.  *See Doyal*, 331 F.3d at 764 (citing *Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001)).

Here, although the ALJ did not expressly state what weight she gave to Dr. Ginsburg opinion, it is clear that she gave the opinion at least partial weight.  She stated that she "affords Dr. Ginsburg's opinion" because it was "consistent with the medical evidence of record overall, and consistent with the claimant's activities of daily living evidence."  R. 76–77.  She also noted that "[a]lthough Dr. Ginsburg was not a treating physician, he is an expert in record review and the disability process, and is a source shown to be familiar with SSA and occupational standards, and not contradicted by any treating source shown to be familiar with SSA and occupational standards."  *Id.*  Subsequently, despite her apparent acceptance of Dr. Ginsburg's opinion, the ALJ failed to fully incorporate into the RFC all of the limitations that Dr. Ginsburg listed in his opinion.  It is therefore unclear whether the ALJ intended to assign Dr. Ginsburg's opinion great weight or only partial weight.

Neither party provides case law indicating whether an ALJ's failure to differentiate between great weight and partial weight regarding the opinion of a nontreating provider is reversible error.  The government argues that the error is harmless because, even incorporating all of Dr. Ginsburg's limitations into the RFC, the remaining qualifying jobs identified at step four would still be sufficient to support a finding of nondisability.  ECF No. 20 at 15–16.  Yet this is conflating two separate issues: the ALJ's error in failing to state what weight she afforded Dr. Ginsburg's opinion; and the subsequent, albeit related, confusion in whether the ALJ improperly failed to fully incorporate Dr. Ginsburg's opinion in the RFC.[1]

---

[1] I separately address below the issue of whether the ALJ erred in calculating the RFC.  In this section I contain my discussion to whether it was error for the ALJ to fail to state what weight she assigned to Dr. Ginsburg's opinion.

The harm that stems from the ALJ's failure to indicate what weight she afforded to Dr. Ginsburg's opinion is the confusion it creates for the claimant in attempting to appeal the decision. This is distinct from the harm of producing an improperly calculated RFC. It is true that confusion between great weight and partial weight is less problematic than confusion regarding whether the ALJ rejected the opinion entirely. Here, had I not found additional errors in the ALJ's decision that merit remand, I might not find that this error alone is sufficient to merit remand. However, because I do find additional errors, I also remand with instructions that the ALJ clarify the weight she provided to Dr. Ginsburg's opinion so as to provide Ms. Barraza with a proper, holistic record.

Ms. Barraza also argues that regardless of what weight the ALJ meant to assign, the ALJ should have afforded Dr. Ginsburg's opinion less weight because he was a nontreating provider who did not review her MRI results and because "a substantial amount of evidence was added to the record" following his examination. ECF No. 19 at 23. Although it is true that Dr. Ginsburg did not review her prior MRI results, he did order and review x-rays of her spine, which on February 19, 2015 showed mild degenerative disc disease and facet arthropathy at L5-S1. R. 370. Ms. Barraza does not point to any evidence that contradicts the ALJ's statement that Dr. Ginsburg's opinion was "consistent with the medical evidence of record overall, and consistent with the claimant's activities of daily living evidence." R. 76–77. Although I do not believe this argument merits remand, I have already remanded with instructions to the ALJ to clarify the weight provided to Dr. Ginsburg's opinion.

## 2. Ms. Winterringer's Opinions

Ms. Barraza also argues that the ALJ improperly weighted the various opinions of Ms. Winterringer, a treating provider. ECF No. 19 at 23–24. In the Tenth Circuit, the opinion of a

treating provider is entitled to controlling weight if it "is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record." *Knight ex rel. P.K. v. Colvin*, 756 F.3d 1171, 1176 (10th Cir. 2014) (quoting *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004)) (internal quotations omitted). "The treating physician's opinion is given particular weight because of his 'unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations.'" *Doyal*, 331 F.3d at 762 (quoting 20 C.F.R. § 416.927(d)(2)).

"An ALJ may decline to give controlling weight to the opinion of a treating physician where he articulates specific, legitimate reasons for his decision." *Raymond v. Astrue*, 621 F.3d 1269, 1272 (10th Cir. 2009) (quoting *Cowan v. Astrue*, 552 F.3d 1182, 1189 (10th Cir. 2008)) (internal quotations omitted). For example, an ALJ may decline to give controlling weight where the treating physician has simply proffered opinions on the ultimate issue of disability— i.e., whether or not a claimant can work—because such opinions are not medical opinions, but rather are administrative findings reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(d).

Here, the ALJ gave great weight to Ms. Winterringer's December 8, 2014 opinion, a doctor's note stating that Ms. Barraza could "return to work without restriction." R. 77, 470. Yet the ALJ gave only partial weight to Ms. Winterringer's more recent January 14, 2016 opinion, a MED-9 Form completed for the Colorado Department of Human Services stating that Ms. Barraza had a physical impairment "that substantially preclude[d] [her] from engaging in [her] usual occupation." R. 77, 456.

Ms. Winterringer's December 8, 2014 doctor's note corresponds to a clinic visit on the same day. R. 334. In the clinical notes regarding that visit, Ms. Winterringer noted worsening

back pain due to due to mild low thoracic and lumbar spondylosis, Ms. Barraza's prior diagnosis of osteoarthritis by a chiropractor, and Ms. Barraza's physical limitations including difficulty moving, a limping gait, and an inability to sit, stand, or push carts at work for long periods of time. R. 334–35. Likewise, Ms. Winterringer's January 14, 2016 MED-9 Form corresponds to a clinic visit on the same day. R. 501. Those clinical notes noted Ms. Barraza's "[c]hronic back pain, unchanged if not worsening," her limping gait, her history of unsuccessful injections, her surgery referral, and the fact that she had "tried many types of work from retail, sitting in an office to cleaning houses and all of which cause her back to hurt too badly to work." R. 501–02.

The ALJ explained that she gave "great weight" to Ms. Winterringer's December 8, 2014 opinion because it was "consistent with the objective record as a whole" and "supported by medically acceptable clinical laboratory techniques." R. 77. In contrast, the ALJ explained that she gave only "partial weight" to Ms. Winterringer's January 14, 2016 opinion because it was not a medical opinion, but rather an administrative finding on the ultimate issue of Ms. Barraza's disability, a finding reserved for the Commissioner. *Id.* The ALJ also noted that Ms. Winterringer's January 14, 2016 "opinion is not consistent with the record as a whole, and it does not contain any actual functional limitations." *Id.*

The ALJ's reasoning for rejecting Ms. Winterringer's January 14, 2016 opinion is superficially valid. As noted, an ALJ may decline to give controlling weight to the opinion of a treating physician where the opinion merely speaks on the ultimate issue of disability or where the opinion is not consistent with the record as a whole. Yet the ALJ does not explain why this reasoning applies to the 2016 opinion but not the 2014 note. She does not explain why Ms. Winterringer's January 14, 2016 opinion that Ms. Barraza cannot return to work constitutes an administrative finding, whereas Ms. Winterringer's December 8, 2014 opinion that Ms. Barraza

can return to work is acceptable. She does not identify anything in either of Ms. Winterringer's opinions, nor does she cite to any other evidence, that explains why the two opinions are either consistent or inconsistent with "the record as a whole." The only specific explanation that the ALJ provides is her statement that Ms. Winterringer's January 14, 2016 opinion "does not contain any actual functional limitations." R. 77. To that point, it is true that the only functional limitation included in the corresponding clinical visit notes is Ms. Barraza's limping gait. R. 501. Yet a medical opinion need not contain functional limitations to be valid, so this explanation alone does not justify the ALJ's reasoning.

It is true, as the government notes, that MED-9 Forms that lack any functional findings need not be given any weight at all. *See Chapo v. Astrue*, 682 F.3d 1285, 1289 (10th Cir. 2012) (noting that such forms are "conclusory"). It is also true that Ms. Winterringer's January 14, 2016 MED-9 Form indeed lacks any functional findings, instead merely ticking a box that provides: "I find this individual is not totally disabled but does have a physical or mental impairment that substantially precludes this person from engaging in his/her usual occupation." R. 456. Yet, as noted, Ms. Winterringer also produced treatment notes from Ms. Barraza's corresponding clinical visit from the same day. R. 501. It is no defense to argue that the January 14, 2016 MED-9 Form must be considered in isolation from corresponding clinical visit notes. If that were true, the December 8, 2014 doctor's note would also have to be treated in isolation from the corresponding clinical visit notes. Yet it appears that the ALJ did not treat the December 8, 2014 doctor's note in isolation from the corresponding clinical visit notes. Rather, the ALJ expressly states that Ms. Winterringer's December 8, 2014 "*treatment notes* and opinion are consistent with the objective record as a whole." R. 77 (emphasis added). Further, if the ALJ had considered the December 8, 2014 doctor's note separately from the corresponding

clinical visit notes, she would be left with a mere two-sentence letter noting Ms. Barraza's ability to "return to work without restrictions"—a letter which, on its own, violates the statutory rule against allowing medical providers to make conclusions on the ultimate issue of disability.

I make no ruling on whether the ALJ must consider the corresponding treatment notes in analyzing, respectively, the opinions in the December 8, 2014 doctor's note and the January 14, 2016 MED-9 Form. However, I do find that the ALJ must treat both opinions consistently, either incorporating the treatment notes into both analyses or neither analyses. I am not convinced that the ALJ necessarily erred in her ultimate conclusion. However, I am concerned by the ALJ's inconsistent treatment of Ms. Winterringer's two opinions, combined with her failure to substantiate that inconsistency with evidence. I cannot rationalize the ALJ's decision with post-hoc justifications. *See Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004) (finding that a defendant cannot cure an agency decision through post-hoc rationalization).

Accordingly, I remand with instructions to reconsider Ms. Winterringer's opinions.

### D. <u>Evaluating Ms. Barraza's Own Statements</u>

Ms. Barraza argues that the ALJ failed to properly evaluate Ms. Barraza's own subjective allegations to her healthcare providers. ECF No. 19 at 24. I am obligated to determine whether the ALJ applied the correct legal standard and whether her findings are supported by substantial evidence. *Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005) (noting that judges "will not upset such determinations when supported by substantial evidence" while concluding that "some of the reasons advanced by the ALJ for finding plaintiff's subjective complaints of pain incredible were not supported by substantial evidence"); *see also Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996). In examining the ALJ's conclusions, I will not "reweigh the

evidence" but rather assess whether the conclusions are reasonable under the relevant standard. *Hendron v. Colvin*, 767 F.3d 951, 954 (10th Cir. 2014).

Here, the ALJ acknowledged Ms. Barraza's testimony that "her impairments have negatively affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, and complete tasks." R. 75. However, the ALJ found that Ms. Barraza's "statements concerning the intensity, persistence, and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record." R. 77. The ALJ explained that Ms. Barraza "has described daily activities that are not limited to the extent one would expect" given her testimony "that she can complete housework, prepare meals, go for walks, and wash dishes." R. 77–78. The ALJ noted that Ms. Barraza worked part time, could perform personal care, did not need reminders to take medication or take care of personal needs, shopped in stores and socialized with others, walked two blocks at a time, and was "fine" at following instructions, handling stress, and handling changes in routine. R. 75.

The ALJ's description of Ms. Barraza's daily activities does not convey the quality of those activities. Although Ms. Barraza stated that she could complete housework, she explained that she had to do so slowly and lightly, and she was incapable of taking the laundry to the laundromat, taking out the trash, or vacuuming the floor. R. 95. Her daughter helped her with household chores. *Id.* She attempted housework approximately twice a month and it generally took her "all day." R. 276. Similarly, although Ms. Barraza did testify that she can prepare meals, she explained that it sometimes took her an hour or more to prepare simple meals such as sandwiches, ramen noodles, soups, and TV dinners. R. 275. Her daughter helped her prepare dinner, for which Ms. Barraza usually merely rinsed the meat, put it in the pan, got out the vegetables, and set the table. R. 100.

Ms. Barraza did work part time, but the ALJ found at step one that "this work is an unsuccessful work attempt because she was out of work at least 30 consecutive days and the work activity was discontinued or reduced to a non-SGA level in 3 months or less due to the impairment or removal of special conditions essential to the performance of work."  R. 72–73.  Although I acknowledge the difference between the SGA analysis and the step four analysis, at step four the ALJ implies that Ms. Barraza's part-time work was a regular occurrence.  R. 75.  Further, Ms. Barraza's only "socialization" was at work, i.e. during that brief "unsuccessful work attempt."  R. 278.  Ms. Barraza asserted that she no longer visited anyone, went to the movies or church, volunteered, or ate out because of her limitations.  R. 102, 277–78.  She shopped only approximately once a month at Walmart.  R. 277.

Nor did the ALJ address certain other aspects of Ms. Barraza's statements.  For example, in addition to general movement issues, Ms. Barraza also explained that she takes a one-hour nap per day because her back pain causes her sleep problems.  R. 100–01.  Ms. Barraza testified that some days she lays in a fetal position and cries in bed for the entire day due to back pain.  R. 95, 105.  After sitting for forty-five minutes, she must get up and move around for twenty to twenty-five minutes.  R. 104.  The ALJ did not explain why she found this incredible, which is significant given the VE's testimony that such restrictions would have eliminated all named job opportunities.  R. 108–09.

I find that the ALJ mischaracterized Ms. Barraza's statements to such an extent that her explanation for rejecting Ms. Barraza's statements is insufficient.  Because Ms. Barraza's daily activities are significantly more restricted than the ALJ provided, the ALJ's decision is not supported by substantial evidence.

The government attempts to retroactively justify the ALJ's decision. For example, the government notes the ALJ's summary of the clinical findings, including normal strength, coordination, and sensation, as well as generally negative straight-leg raise tests. ECF No. 20 at 18. The government also notes inconsistencies in the evidence. *See Wilson v. Astrue*, 602 F.3d 1136, 1146 (10th Cir. 2010) (finding that ALJ reasonably noted inconsistency between claimant's statement that she could not use her hands and evidence that she wrote a fifteen-page letter); *Shepherd v. Apfel*, 184 F.3d 1196, 1202 (10th Cir. 1999) (finding that evidence a claimant did mechanic work even after the alleged onset of disability supported a finding of non-disability). Specifically, the government notes that while Ms. Barraza told the SSA that she could only walk two blocks at a time, she told Dr. Ginsburg that she walked about a mile every other day. R. 279, 366. And while Ms. Barraza said she had difficulty lifting anything, she also lifted her grandson in a car seat (although she did injure herself by slipping and falling while attempting to do so). R. 586. Most notably, despite claiming that she was unable to work, the government characterizes Ms. Barraza's statements as "admitting that she worked on a regular basis" and even asked her treatment provider to return her to full duty. ECF No. 20 at 19; R. 278, 586–87. Of course, as discussed, this last inconsistency relates to the brief "unsuccessful work attempt" that the ALJ described at step one. R. 72–73.

Regardless of the merits of these arguments, they are the government's arguments, not the ALJ's arguments. Nowhere in the decision did the ALJ point out any specific inconsistencies between the medical evidence and Ms. Barraza's statements, nor did she note any factual inconsistencies among Ms. Barraza's statements regarding her daily activities. Instead, the ALJ merely summarized the medical evidence (albeit in detail) and stated summarily at the end that "[t]he medical evidence of record does not entirely support the claimant's allegations regarding

her impairments." R. 75–78. The ALJ did not explain which aspects of that medical evidence contradicted Ms. Barraza's allegations. The government cannot retroactively justify the ALJ's decision with post-hoc rationalizations. *See Allen*, 357 F.3d at 1145.

Although it is true that the ALJ is in the best position to analyze the evidence, here the ALJ mischaracterized the evidence and did not sufficiently explain how she reached certain conclusions. Although the government highlights certain compelling facts, it cannot retroactively justify the ALJ's decision. Accordingly, I remand for reconsideration of Ms. Barraza's subjective allegations.

### E. **Step Four Error—RFC Calculation**

Finally, Ms. Barraza argues that as a result of the ALJ's error of failing to state what weight was given to Dr. Ginsburg's opinion, the ALJ subsequently erred by improperly cherry-picking within Dr. Ginsburg's opinion in calculating the RFC at step four. ECF No. 19 at 22. The government responds that this constitutes harmless error. ECF No. 20 at 15.

I do not specifically address this argument because I find that the RFC must be recalculated regardless on the basis of the other errors on which I remand.

### ORDER

For the reasons above, the Court REVERSES the Commissioner's decision denying Ms. Barraza's application for DIB and REMANDS for reevaluation of the evidence consistent with this order.

DATED this 24th day of February, 2020.

BY THE COURT:

35

_____
R. Brooke Jackson
United States District Judge